at all. Arguments not to exceed 15 minutes per side. Mr. Islam for appellant. Good morning. Good morning, Your Honors. May it please the Court, Sajid Islam on behalf of the Appellant Citizens Insurance Company. Your Honors, this case involves the interpretation of two insurance contracts, both of which insured by Mr. Samuel McNeeley at the time of his motor vehicle accident in 2017. In particular, it involves interpretation of the other insurance clauses contained in these contracts. The District Court denied Citizens' motion for summary judgment and granted the McNeeley's motion for, counter motion for summary judgment. And appellants contend that the District Court erred in making three important determinations. The first and most important is that the District Court determined that the all-state other insurance clause was an excess insurance clause, whereas the Citizens' other insurance clause was a pro-rata clause. Based on that initial determination, the District Court found that the maximum recovery provision contained in the Citizens' insurance contract did not apply because Citizens was required to pay first. Secondly, the District Court found that the trust agreement contained in the Citizens' insurance contract did not apply because all state and Citizens were not in the same tier. So going to the first determination that the District Court made, that Citizens' policy contained a pro-rata clause, whereas all states' policy contained an excess clause, the remainder of the determinations made by the District Court essentially hinge on this decision. And that decision was erroneous for a few reasons, Your Honors. Oh, go ahead. Keep going. Sorry. Okay. So in Pioneer State Mutual Insurance Company v. TIG Insurance Company, a Michigan Court of Appeals decision Maybe I'll let you go back to that case. Sure. So when you say, is your main theory that they're both excess clauses? Yes. And the tie means pro-rata. Is that your main theory? Yes, Your Honor. And so is your main argument for why the Citizens' clause is excess this one about the you don't own the vehicle? You don't own the vehicle plus the order of priority provision. Well, why don't we just do one at a time? So why isn't the you don't own the vehicle the situation where you're borrowing a car, it's a child using your car as opposed to the vehicle you don't own hits you? Like that would be my Occam's razor approach to that language. What am I missing? Sure. And I think the plain language, so reading the plain language of the policy under Michigan law, that's when it's clear and unambiguous, that's what the courts are required to do. It states that any insurance we provide for a vehicle you do not own. So that first clause of that provision states that any insurance we provide, in this case, Mr. McNeely was hit by a motor vehicle that he did not own. He was a pedestrian. So the whole premise of my question was I understood that point. And I'm trying to say, you know, the key principle of interpretation is to look at words in context. Words are known by the company they keep and so forth. In context, isn't that language about the situation where it's a borrowed vehicle? What am I missing about that? No, I think it's intended to cover any vehicle that's involved where that vehicle is. If there's not a vehicle involved in the accident, we don't get this coverage in the first place. Is there a case that deals with this clause and says it applies across the board, even if the vehicle, you know, you and everyone you know has no connection to the vehicle that hurt you. You're hit by a vehicle as opposed to having someone else drive a vehicle. Is there a case that says, per your interpretation, the plain language controls, because it literally is a vehicle you don't own, even though the problem is it hit you, not that someone used it? Yeah, there are various cases that state the problem. What's the one case that's, just give me one case that construes that language and says it applies to a vehicle that hit you? So in reference to this particular language, this is contained in the citizen's policy. I'm not aware of any other cases that interpret this specific citizen's policy. Or, no, other, I don't care if it's your policy, just this language, this kind of language. Sure, and I was just going to point to case law that states that you look at the plain language of the terms itself, so. That's not really informative.  Counsel, do you have the citizen's endorsement, the uninsured motorist coverage endorsement, Part C, with you today? I can grab it from the. Can you grab it?  I'm looking at page one of Part C of uninsured motorist coverage, the insurance agreement. And I'm looking at paragraph A, and it talks about, do you have it with you? I'm flipping to it now, Your Honor, I apologize. I have the entirety of the policy attached, so I'm trying to turn to it. It's Part C, insuring agreement, uninsured motorist coverage. I mean, this is where it starts. We're talking about what your policy provides for uninsured motorist coverage. So I think we start at the beginning, which is Part C. Do you have it now or not? I do not, Your Honor. I'm struggling to find it here. Okay, uninsured and Part C. Paragraph A, we will pay compensatory damages which the insured is legally entitled to recover from the owner or operator of an uninsured motor vehicle. Okay, next paragraph. The limits of liability under this policy to the uninsured motor vehicle we will pay after they have been exhausted by payment or judgment or settlement. The limits of liability, bonds or policies applicable to the uninsured motor vehicle have been exhausted. I mean, I think that paragraph clearly says that your policy is in excess to the policy on the uninsured motor vehicle, which is State Farm, right? Yes, I would agree. Okay, so I think that clearly provides you're an excess carrier. So should we read that paragraph in connection with the other insurance paragraph that we're focusing on, which is other insurance paragraph 2? Should we read the policy in conjunction with itself, is my question. I recognize the focus of the ruling below was strictly on this other insurance paragraph, but we have to read the policy altogether. And my question is, does the prefatory section as to, yes, you're definitely excess to State Farm here, have any relevance to this paragraph? Yes, Judge Griffin, I believe that it does, and I would agree that we have to read the contract as a whole, not just one portion of the contract in a vacuum, which I believe is what the district court did. So, yes, I believe that prefatory provision does provide that this is an excess policy. I don't think there's any question. Is there that it is excess to the State Farm policy that the tort fees are had? That that is the primary policy here, right? Yes. I don't think they dispute that. And because that is, that's why they deducted the $25,000 settlement from State Farm from your million-dollar limit, right? Correct. Okay, so anyway, the bottom line is you are an excess carrier, right? Yes. And Allstate also is an excess carrier. Yes. And they actually specify that if the liability arises while you're a pedestrian or whatever, that, I mean, they're very clear about the situation. Right. And here, your policy just says you're excess if there is insurance on the tort fees policy, then you're excess. Yes. And then after that, then you say we prorate it because we're the same order priority, right? Correct. Okay, I'm just trying to simplify it. I appreciate it, Your Honor. Tell me, does the clause I asked you about, is that what makes it always excess? Well, first, by nature, I mean that they own a vehicle, you do not own language. Is that what makes it an excess policy? I believe that in connection with the preparatory provision as well as the order of priority that follows that provision. So the order of priority provision right after that says the following priorities of recovery apply. And there's a first tier that says underinsured motorist coverage on the vehicle that the person is occupying, that the insured is occupying. And so that would be the first tier of coverage. And the second tier, which is the highest tier under the policy, states that the second tier is any other policy affording underinsured motorist coverage. So it's kind of a catchall for if you don't actually insure the vehicle, here's all the other insurance companies that will be in this order of priority. What's confusing to me about this is in an underinsured setting, you're always talking about another vehicle. Yes. So this language, a vehicle you do not own, always applies. Well, no. By definition, you're hit by a vehicle you don't own. And it's underinsured, so voila, it's always excess. No, because if Dr. McNeely was in his own vehicle at the time, then it wouldn't be related to that. We're not even looking at that secondary provision. But I mean, in an underinsured motorist setting, it's always about somebody else that's underinsured. Yes. You're always hit by somebody else. So if you're right about this language, that language always applies. It always makes it excess. If the language said any insurance we provide with respect to an underinsured vehicle you do not own, I would agree. But it doesn't say that. It says with respect to a vehicle you do not own. And so it's not always the case that we're going to be looking at the underinsured motor vehicle. So if McNeely was in the vehicle that was insured by Citizens, this policy wouldn't apply by its plain language. But if you're looking at, for example, in this case where another vehicle that McNeely did not own struck him and he doesn't own that vehicle, then you have to apply this provision because the insurance that's being paid is totally a result of the vehicle that he did not own and no other vehicle because he was a pedestrian. And so that's another reason to look at why this is an excess policy. And then thirdly, the order of priority, I think, clarifies this is not a first-level policy. It's a second-level policy. And the Allstate policy would be in the same exact… What do you say about the St. Paul decision that suggests if it's pro rata, it's primary? I think the St. Paul decision establishes that a pro rata policy is primary, whereas an excess policy doesn't pay until the pro rata does. But isn't this policy pro rata? I don't believe it is. Paragraph 4, which seems to suggest it's pro rata. Sure, and Paragraph 4 is what the District Court relied upon in making that determination that this is a pro rata clause, which I think the District Court kind of looked at it in a vacuum. If you look at the language of the policy, it actually says we will pay only our share of the loss. Our share is the proportion that our limit of liability bears to the total of limits applicable to the same level of priority. And so we're, again, looking at the levels of priority that citizens establish in its policy. There's two levels. The first level would be the primary level, and the secondary level would be the excess level. In St. Paul, the two companies that had the pro rata clause were both primary carriers, weren't they? Yes. And here there's no doubt the primary carrier is State Farm. The insurance company that insured the tort visa, right? That's the primary one.  And these are excess to the primary carrier, and therefore they're both pro rata and they're considered the same. I mean, I think this is relatively simple. If you recognize State Farm is primary and citizens is not, they're secondary to State Farm. I mean, I don't think anybody can dispute that. And to add to that, Your Honor, the District Court looked at the citizens policy language and that provision that Judge Mathis and Judge Sutton referenced, the pro rata provision, quote, unquote, if you look at the all-state policy, it contains the same exact language. If you look at page 10 of the appellee's brief, it states, if you are injured as a pedestrian, this coverage will be excess. The very next line says we will bear our proportionate share of the damages payable. Every policy that I've seen, and I've litigated a lot of cases like this, contains that provision to some extent, that we will bear our share. Why would we bear more than our share? That's the way a lot of these policies work. Reading that sentence in a vacuum would make you think, yes, that is a pro rata provision. But if you read the entirety of the policy, I think Judge Griffin made a great point. The State Farm policy is the primary policy here. And then you get to the secondary level. Both these policies say they're excess. And so what we have here is two competing excess provisions. And to go back to the St. Paul case, you had St. Paul Insurance Company and you had CNA Insurance Company. Their policy provision said we will pay our proportionate share of all other collectible insurance, whereas the American Homes policy, the defendant in that case, their policy said we will pay our proportionate share unless your claim arises before the inception of this policy, in which case we will be excess to all other insurance. And so that's why the court found that those two policies were pro rata versus the American Homes policy being an excess one. It's not the case here. Citizens is not saying we're going to pay our proportionate share with all other insurance. It says all other insurance on the same level of priority. And under the policy, if you look at it, there's two tiers of coverage again, and both citizens and all state fall into that secondary tier. Nobody argues you're on the same level of priority as State Farm, do they? No, not that I'm aware of. Everybody agrees that State Farm's $25,000 kicks in first, and then you're excess for that. I think. I don't think anybody says you're on the same level as State Farm. It would be ridiculous if they did. Sure. And if I could just make one last point, Your Honors. I see my time is up. So in the Supreme Court decision, Boston v. Bauermeister, Michigan Supreme Court decision, the Michigan Supreme Court basically set forth three layers of insurance coverage. There's a primary layer, there's an other insurance excess layer, and there's a true excess layer. I think both of us fall into the other insurance excess layer here. Neither of these are true excess policies like you would see in an umbrella policy that says we're not providing coverage until that underlying policy is exhausted. And specifically if you look at Pioneer, for example, both those policies say that we are excess except to insurance that says it is specifically excess to us. So there is another level of excess that is available, and I don't think either of these policies apply as true excess. They're both basic auto policies that everybody purchases for their vehicles. How long does it take three years to figure this argument out if it's so simple? So after the payments, there's multiple settlement negotiations. There have been settlement negotiations, I think, for three years before this case was actually litigated. And even in the course of this litigation, we've attempted to settle this case multiple times without any success. So that's why it took so long. We've been trying to settle this case and it just didn't happen. All right. We'll hear from the other side, and you'll get your rebuttal. Thank you, Your Honors. Good morning, Your Honors. Douglas Young on behalf of the appellees McNeely and Hendricks. I think the Court had some interesting questions that I'm going to try and address and do my argument a little bit out of order. I'm worried about confusion when we refer to the underlying automobile as the primary insurer because the underlying automobile's insurance is paid first. I would agree with that. But I would agree that uninsured and underinsured motorist coverage is contractual in Michigan. It's not required by statute. So I don't – while I would agree the underlying tortfeasor's policy, the State Farm policy, paid the $25,000 first, that can only be done with citizens' consent because they have a right to subrogate against that person for the full extent of their payment. But I wouldn't consider that policy the primary policy in this accident. It's the policy of the tortfeasor and it goes first. But these two policies – What does primary mean if it doesn't mean it goes first? Well, I would interpret primary to mean primary as to the insured. Both the citizens' policy and the all-state policy have the same common insured, Dr. McNeely. So there we're compelled to go to the other insurance provisions. And the all-state policy has that exception for pedestrians. And Judge Sutton's question about the vehicle in an underinsured motorist situation, there has to be another vehicle. And the citizens' policy defines uninsured motor vehicle to be a motor vehicle which bodily injury policy applies at the time of the accident. But its limit for bodily injury is less than the limit available for this coverage. And it doesn't matter whether it's pedestrian or not. I mean, it's just always another vehicle. Correct. But that's the distinction with the all-state policy where they took specific care to say – and Judge Sutton's point was a good one – that there are circumstances where uninsured motorists or underinsured motorists apply when you're a passenger in somebody else's vehicle or you're driving with your children in their vehicle. So there isn't a reason for that. But pedestrians are a whole different matter. And the citizens' policy did not take care to make a third exception for pedestrians, whereas the all-state policy did. And it expressly states if you're a pedestrian, we're excess. Another anomaly, if you will, of this all-state policy is Florida allows stacking. And the stacking provisions of the all-state policy say that you can recover under two policies, and this one will be stacked on top of the prior policy. I thought we were dealing with Michigan law, not Florida law. Well, we are, Your Honor. This citizens is the Michigan policy, but the all-state policy was a Florida policy. What are you saying? What law are we applying in this case? Michigan law. Okay. But I think we have to interpret the all-state policy as it's written pursuant to its terms, which does allow for – We don't apply Florida law. We apply Michigan law to the Florida policy. You shouldn't have said Florida. It just so happens the all-state policy has the stacking provisions because they're allowed there, but we still honor the contract in Michigan. Yes, Your Honor. Okay, just ignore Florida. Pretend you didn't say it. Okay. It also reminds me where I'd rather be, so keep going. Yes, Your Honor. The other point I wanted to make about pro rata and excess, if citizens' position were that it was excess and both policies being excess, then we apply a pro rata sharing, then they would have come up with, rather than paying their 975, they would have said we were going to share two-thirds, one-third, because we have a million-dollar policy, all-state has a half-million-dollar policy. Weren't they negotiating with all-state before they did pay? I know the negotiations were done and all-state paid later their 500,000, but there were negotiations going back and forth, weren't there? Well, Your Honor, I would say there weren't negotiations going forward. There was analysis between the two policies. There was contact and this and that. There was. They might be subject to a bad faith claim if they didn't pay promptly their uninsured motorist benefits here, and to say that they should be penalized because they paid promptly and avoided a bad faith suit, I don't think is a very good argument. I want to make sure I'm understanding because I thought it might be a good point. Is the point you're making that if citizens think it's a pro rata, in other words, one way to think about it, and this is the way your friend put it, what we really have here are two excess policies. They both have pro rata provisions and, therefore, there ought to be a pro rata payment, and if that's citizens' theory today, which it is apparently, why didn't they pay out pro rata is your point. Exactly, Your Honor. In other words. To answer the question, they don't know if all-state is going to honor their obligation or not. They hope that all-state will come through and pay their $500,000, but they have no assurance that they'll do it. All-state didn't represent they would do it. So rather than just pay part of their $1 million, they had to pay the whole thing. Otherwise, they really would be subject to bad faith claim. Well, Your Honor, I would. How do you respond to that? Well, Your Honor, first, all-state does have an obligation to timely pay benefits. I would agree with that. Whether they do it or not, citizens can't be sure of it. That's all. Right. Well, Your Honor, I would respond to that with, they were in contact, both citizens and all-state, they're adjusters and I attached the emails, were in contact and asking the questions, is all-state going to pay its $500,000? We're going to pay. They both knew simultaneously that they were going to pay. And all-state paid, and within two weeks, I'm sorry, citizens paid, and within two weeks, all-state paid. They both came to the knowing conclusion that $1.5 million was owed under this policy. Citizens at no point said, we're entitled to pro rata here, we're going to pay you the million dollars, but if all-state does pay, we're entitled under our policy to recover that payment. And there was no discussion about what the pro rata shares would be. Well, it's a little speculative. What's the legal argument there? Okay, you're telling me what the facts are. What's the legal argument you're making out of that? Waiver and estoppel, Your Honor. Waiver and estoppel. Let's just try, on the St. Paul decision, help me a little with that. I was thinking when I first read it, and I think I probably didn't understand it entirely, but I had a little bit of a eureka, oh, I see. The Michigan Supreme Court is saying when it's pro rata, you can treat it as primary, and it's pretty easy to think of all-state as excess. Voila, that's how to do this. But I take it I was maybe reading it too quickly. St. Paul, they're not denying the possibility you could have pro rata at the excess level. So it's a little bit question-begging. In other words, it really doesn't indicate every time there's pro rata, it proves that policy's primary because you could have two excess policies with pro rata, and then you're back to where you started. Yes, Your Honor, and I would say voiding the term primary is most useful. If two policies are of the same level, and they have pro rata sharing, they will share pro rata. Right. So it really doesn't help you. St. Paul doesn't really help us figure out whether this, in this case, citizens as primary, is what I'm trying to get at. Yes. If you had to rank your first or second best arguments, what proves citizens as primary, because we all know all state is excess, so the question is whether citizens is primary or excess. What are your one or two best arguments for why we should call this primary? Well, the first argument would be they took full advantage of the underinsured motorist vehicle's $25,000 limit. If they were pro rata, they would only be entitled to their pro rata share of that $25,000. So again, like inconsistent behavior. I get the point. Right. That's a good point. Yep. You know, the next point, I guess, in the whether one is primary or one is excess, would be they only create two scenarios in orders of priority. And those orders of priority are. When you say they, I'm sorry. I'm sorry, citizens. I apologize, Your Honor. When you go to their policy language, and that's the UIM endorsement. We can find it. Okay. Tell me the essence of the point. The essence of the point is, Your Honor, that they have two priorities. One is, if you're occupying a vehicle that. The first is the uninsured motorist coverage is applicable to the vehicle the insured was occupying at the time of the accident. The first priority does not apply. He wasn't, Dr. McNeely was not occupying any vehicle. Then the second one goes to any other policy affording uninsured motorist coverage. The next, that's under paragraph three, the priorities of recovery. Then paragraph four says, we will only pay our share of the loss. Our share is the proportionate that our limit of liability bears to the total of all limits of liability applicable on the same level of priority. It doesn't say we will be excess, as the all-state policy does. It doesn't, I mean, I recognize that below the focus was on the other insurance clause. But, I mean, I usually read the whole contract. And I pointed out to Citizens Council how this endorsement starts with part C, uninsured motorist coverage. And I think paragraph A there clearly says it's excess to the tort visas policy. Am I wrong about that? Well, no, Your Honor, you're not wrong in saying that it's excess. But I think that causes confusion in, when I'm using the terms primary and excess, I'm talking about citizens and all-state. This is a first-party coverage to the insured Dr. McNeely. It's not excess in the context of the underlying insurance of the tort visa. That pays first, I will recognize that. But that doesn't make this, this is first-party coverage that begins on dollar one if the insured were uninsured. It's not PIP benefits, first-party benefits. This is for his claim against, it's his liability claim against the driver that hit him. And the liability insurance for his bodily injury, I mean, this isn't a, yeah, personal protection insurance benefits in Michigan is what you have for first-party benefits. This is a third-party claim. And uninsured motorist kicks in after the underinsurance has exhausted their limits. So, Your Honor, if I may clarify on that a little bit. If I said the word first-party benefits, I apologize, that's wrong. What I'm saying is underinsured motorist benefits are a first-party coverage, and I'm saying first-party in the context of third-party versus first-party. Contractual, it's a contractual benefit. Right, that they purchase. But what it does is it's substitute for the tort claim that has inadequate coverage. Yes. From the underinsured motorist. So it's, yeah, it's tort damages under the, anyway, I think we agree on that. Help me, just shut me down if this is a bad line of inquiry. I trust you, but sometimes it helps to invert the problem. Like what if the problem here was Dr. McNeely, I've got it right, Dr. McNeely injures somebody. So he's driving, he injures somebody, it's just as catastrophic, it's horrible. Does the way that payout would work inform us when we talk about citizens in all state? Well, that would be a third-party tort claim. I got it that it's totally different. I'm trying to figure out if it casts. This uninsured motorist provision would not apply if Dr. McNeely were operating the vehicle, except for if there were a passenger in his car. Conceivably, it could cover them for any shortfall, if they were a relative, for example. I guess what I'm trying to capture is whether, in my example, citizens would pay first. So, in other words, Dr. McNeely, it's his fault, he injures this person, they have loads of damages. Would citizens pay first? Well, I hate to always answer with that depends. Remember, he has two policies, one for two vehicles in Michigan and another for one vehicle in Florida. So in that instance, it would depend on which vehicle he was in when he injured the other person. So it's a bad question. All right, thank you. Sorry to waste your time. So, Your Honor, I just wanted to make a couple of points that I didn't fully discuss. You know, the district court, I believe, got this correct, obviously, but it did not find that there was ambiguity in the policy. It applied the terms of both policies and came to the conclusion it reached. If it had found ambiguity, we would have been allowed to admit evidence of pattern practice, evidence of behavior. At no time did citizens ever say, we are going to prorate this policy payout. They had them sign a release, and citizens argue that it's a one-way release, and they can have a release and have their key needed, too. They can then come back and sue. I would disagree with that because the release says that citizens is paying and McNeely will accept, as full satisfaction, $975,000. But isn't the only obligation of citizens to pay? They didn't agree to do anything other than pay, did they? No. Okay, so if they didn't agree, then why can't they sue? Well, Your Honor, I would say if, as this was the case, both sides, all state and citizens lawyers were involved, I would put a reservation. What's the language in the agreement that says citizens can't come back and make it prorata? There isn't any, Your Honor. I don't see how you have an argument. We're dealing with a written release, a written contract, and it does not provide that citizens can't sue. So you're saying, I don't know what your argument is. Well, Your Honor, I guess I would say is we have the spouse, Dr. Hendricks, negotiating with citizens, citizens lawyers preparing a release, and at no time do they advise her of, we're paying this temporarily, we're taking. . . Do they have a legal obligation to do so, and if so, what's the authority? Well, Your Honor, I don't know if they have a legal obligation to do so other than candor with their insured. All right, well, we don't really rule on candor up here. Where's the release? We'll take a look at it. It's in the record, I assume. It is in the record. The citizen's release is at 23-9, and the all-state release is at 23-10. In the paragraph I was referring to, paragraph 3 says, citizens shall pay and McNeely agrees to accept the total sum of $975,000, the payment, in full payment consideration and satisfaction of all claims asserted or which could have been asserted by or on behalf of McNeely against citizens, based upon, related to, or arising out of the incident. Now, this is a one-way release, but I think that phrase encompasses a total settlement for $975,000. I see my time is up. Yeah, no, thanks for. . . It looks like Judge Mathis might have had a question. All right, thank you very much. Okay, we'll hear rebuttal. Your Honor, just a few points on rebuttal. I think it was represented that the all-state policy is a stackable policy, and it says that if the policies are stacked, all states are going to be on top of all other policies. That's not what it says. It doesn't specify that it's excess specifically to other excess policies. Your policy has an anti-stacking provision, and it doesn't, does it not? It does. There's actually a heading about anti-stacking, right? Correct, and that's basically. . . Basically, they want it to stack. Yes. That's what the case is about, isn't it? Yes, correct. They want to stack the all-state policy on top of the citizens, and you have a whole paragraph, anti-stacking, right? Correct, yeah. And the plain language of the policy should be enforced as written. Going further, as it relates to the settlement agreement and the settlement discussions and all those things, I think Judge Griffin made an excellent point that citizens paid. . . Okay, so first of all, citizens paid before all-state. There was communications with the insured from citizens and from all-state who are wholly separate companies. They're not talking to each other saying, hey, we're going to pay this much on this date, you guys pay this much on the next date. So citizens has an obligation to the insured. Not only are they subject to a bad faith claim, but there's Michigan Supreme Court precedent as well, the Nicola case. I don't have the site before me right now, but it's the Nicola case in Michigan, which can subject an insurer to penalty interest on top of what they pay if they don't pay once reasonable proof is received. So citizens had an obligation, time was ticking, and all-state had not made a payment. Citizens had no idea if, when, or how much all-state was going to pay. What if all-state paid $5? But that's not the case here. So citizens paid when it paid, and no other entity had paid at that point other than State Farm. So why did citizens take the $25,000 cut? Because that's what the policy allows it to do. You're not entitled to a duplicate payment. You're entitled to offset the amounts paid by the tortfeasor from the amounts that you were paying. At that point, it was just $25,000 that had been paid. Why didn't all-state do that? Because all-state paid second. And so that offset had already been taken. Yeah, but, I mean, that's consistent with the fact they're excess. Well, no, the all-state policy stacks on top, according to the all-state language, stacks on top of the citizens' policy. So their policy is totally different than what citizens says, where you're not allowed to stack. Citizens took the offset because it was the one that paid first. Out of curiosity, in this release argument, you have a release, it says this is everything in full. After the release, because you claim it's one way, citizens comes back and makes this argument and several other arguments to recapture a bunch of the money. At that point, could Dr. McNeely and his spouse say you're engaged in bad faith and then collect on a tort, or would you be able to invoke the release at that point? I don't believe so, Your Honor, because the release is actually. . . So the release really does cover everything. I believe it covers citizens' payment. So citizens made a $975,000. . . Yeah, no, I'm just making the point that that's extraordinary, that your client could act in bad faith and this release would cover them, but yet it doesn't finalize the payment, which, you know, that's just crazy talk to me. Well, what I'm trying to clarify, though, is citizens isn't trying to get its $975,000 payment back. I'm making the hypothetical. . . It's partly a hypothetical point. You're doing this. . . The McNeelys will lose some money, right? They will lose the $500,000 that would also be paid.  And I'm making the point, if that's okay, why can't they come up with some other argument with a clever adjuster and say they get, you know, whatever, $750,000 back, and let's just say that last argument is truly bad faith. It's deserving of compensation. You're saying the release would cover that and they could not come back and bring a bad faith claim. Well, okay, so I think all of this stems from the trust agreement in the citizens contract that requires them to hold the monies paid after citizens in trust and to reimburse citizens from that money. So we're talking about this secondary payment, not the initial $975,000 that is the subject of the release. We're talking about this $500,000 payment from after citizens made its payment. So arguably . . . Is there a release there? No. Well, with Allstate, but I don't know what that release . . . You know, we're not . . . Citizens isn't a party to that release whatsoever. But to the extent that, you know, just in your hypothetical situation, Your Honor, if the McNeelys want to argue that, hey, this is a bad faith issue, I would . . . I mean, that's, I believe, separate from the initial payment made by citizens. So I don't believe . . . You said you would invoke the release. I don't know that the release would cover that because it's a secondary payment that they were supposed to hold in trust from a separate entity to pay back citizens. It's a contractual claim after the fact of the settlement that was reached with citizens, if that makes sense. But I'm just kind of curious. Forget what happened in this case. It's pure hypothetical. Yep. So I think . . . You want to come back and claw back some of the $975,000, and you would say, sorry, you can't sue us for bad faith. It's . . . I don't believe it's clawing back the $975,000. So they keep . . . It's a hypothetical. It's a hypothetical. Ignore this. They get a release. They've got their $975,000. They can't get any more. You come back, because it's one way, and say, we're going back to ground zero, we're making up all these arguments, and we're getting all $975,000 back. They would be limited in bringing a bad faith claim because of the release. I don't know if I can answer that hypothetical because the citizens policy wouldn't allow us to get . . . But hypotheticals, by definition, are not about this policy. They're about another setting, trying to figure out what a release means. Sure. One way. That just seems quite unfair. I mean, respectfully, I don't know that the release would cover the hypothetical situation. I also don't believe that the citizens policy would allow them to collect the $975,000 in the hypothetical situation. So I see my time is up, Your Honor. I was going to try to take the challenge of answering your prior question about the passengers, but if you'd like, I can return to my seat. What's the question? You had a question for Brother Counsel about if McNeely was operating a vehicle, would citizens be first in priority? Oh, I thought we decided it was a bad question. Yeah, so I was going to try to take that challenge of answering that question. Oh, you wanted to finish by saying, yes, Judge Sutton, it was a bad question. Okay, I don't know. I was going to try to answer it. All right. Well, thank you, Your Honors. It was a pleasure. All right. Thanks to both of you for answering our questions and for your helpful briefs. We appreciate it. Thanks so much. The case will be submitted.